# "Protected Person" Status in Occupied Iraq Under the Fourth Geneva Convention

The Geneva Convention Relative to the Protection of Civilian Persons in Time of War (IV) governs the United States occupation of Iraq.

The following persons, if captured in occupied Iraq, are not "protected persons" within the meaning of article 4 of the Fourth Geneva Convention: U.S. nationals, nationals of a State not bound by the Convention, nationals of a co-belligerent State, and operatives of the al Qaeda terrorist organization who are not Iraqi nationals or permanent residents of Iraq.

March 18, 2004

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

I. The Scope of Coverage of the Fourth Geneva Convention ............................... 36
    A. Armed Conflict With Iraq ........................................................................ 36
    B. Armed Conflict With al Qaeda ................................................................ 38
II. "Protected Persons" in Occupied Territory ..................................................... 40
    A. Geographical Limitation .......................................................................... 41
    B. Citizens of the Occupying Power ............................................................ 42
    C. Nationals of a Non-Signatory State ........................................................ 43
    D. Nationals of a Co-Belligerent State ........................................................ 43
    E. Nationals of a Neutral State in the Territory of a Belligerent State .......... 45
    F. Persons Protected by Another Geneva Convention .................................. 47
    G. Unlawful Combatants ............................................................................... 48
III. Al Qaeda Operatives in Occupied Iraq ......................................................... 50
    A. The Interpretive Problem ........................................................................ 50
    B. The Benefits-Burdens Principle of the Fourth Geneva Convention .......... 53
    C. The Focus of the Fourth Geneva Convention on Protecting Citizens
       and Permanent Residents ........................................................................ 57
    D. Iraqi al Qaeda Captured in Occupied Iraq .............................................. 60
IV. Conclusion ..................................................................................................... 61

The Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("GC4") provides "protected persons" with certain protections if they "find themselves" in occupied territory or in the home territory of a party to an armed conflict. *Id.* art. 4, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. You have sought guidance on whether various categories of persons captured by U.S. forces in occupied Iraq—and, in particular, al Qaeda operatives—have "protected person" status under GC4.

Part I of our opinion discusses the threshold issue of when GC4 "applies" to an armed conflict or occupation and concludes that GC4 governs the United States occupation of Iraq. Part II addresses GC4's general criteria for determining

"protected person" status, as well as the categories of persons that GC4 clearly excludes from its definition of "protected persons." Part III addresses the status of al Qaeda operatives in occupied Iraq. It concludes that al Qaeda operatives captured in occupied Iraq who are neither citizens nor permanent residents of Iraq are not entitled to "protected person" status.*

## I. The Scope of Coverage of the Fourth Geneva Convention

GC4 does not apply to every conceivable armed conflict. Article 2 of GC4—an article that is worded identically to the corresponding provisions in each of the other three Geneva Conventions—contemplates only three circumstances in which the Geneva Conventions "apply": (a) in "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties," *id.* art. 2(1); (b) in "cases of partial or total occupation of the territory of a High Contracting Party," *id.* art. 2(2); or (c) when a non-signatory "Power[] in conflict" "accepts and applies the provisions [of GC4]," *id.* art. 2(3).

The United States is currently involved in two armed conflicts that are relevant to our analysis: the armed conflict with and occupation of Iraq, and the armed conflict with al Qaeda. In this Part we analyze how article 2 applies to each conflict *considered independently*. This analysis is not conclusive as to how GC4 applies when the two conflicts become intertwined, as they may when al Qaeda operatives carry on their armed conflict against the United States in occupied Iraq. This latter issue is addressed in Part III, *infra*.

## A. Armed Conflict With Iraq

As this Office has previously explained, the armed conflict with Iraq began in January 1991 and continued beyond March 19, 2003, the date on which President Bush ordered United States military forces to invade Iraq in response to Iraq's "material breach" of an earlier ceasefire agreement accepted by Iraq on April 6, 1991. *See* Exec. Order No. 13290, 68 Fed. Reg. 14,307 (Mar. 20, 2003) (determining that the United States and Iraq are "engaged in armed hostilities"); Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Authority to Provide Military Equipment and Training to Allied Forces and Resistance Forces in Foreign Countries* at 2 (May 6, 2003) (determining that a state of armed conflict has existed between the United States and Iraq since January 1991).

---

* Editor's Note: After this opinion was issued, the Supreme Court held in *Hamdan v. Rumsfeld*, 548 U.S. 557, 629–31 (2006), that common article 3 of the Geneva Conventions is applicable to the United States' armed conflict with al Qaeda. *See infra* notes 5 & 20. We also note that the published version of this opinion omits a lengthy appendix (and a footnote referring to it) setting forth provisions of the Geneva Convention referred to in the opinion.

In the spring of 2003, the United States and its allies defeated the Iraqi forces. GC4 does not itself provide criteria for determining when the occupation of Iraq began. The rule under customary international law is that the United States is an occupying power over any Iraqi territory that is "actually . . . under the authority" of the United States. *See* Hans-Peter Gasser, *Protection of the Civilian Population, in The Handbook of Humanitarian Law in Armed Conflicts* 240–41, 243 (Dieter Fleck ed., 1999); *Prosecutor v. Dario Kordic and Mario Cerkez*, Case No. IT-95-14/2-T, Trial Judgment ¶¶ 338–39 (Feb. 26, 2001); *see also* Regulations Respecting the Laws and Customs of War on Land ("Hague Regulations") art. 42(1), Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631 (annexed to Convention (IV) Respecting the Laws and Customs of War on Land) (same).[1] Applying this standard, the United States became an occupying power no later than April 16, 2003, the date on which General Tommy Franks announced the creation of the "Coalition Provisional Authority to exercise powers of government temporarily, and as necessary, especially to provide security, to allow the delivery of humanitarian aid and to eliminate weapons of mass destruction." *See* Tommy R. Franks, *Freedom Message to the Iraqi People* (Apr. 16, 2003).[2]

Both the United States and Iraq have ratified GC4.[3] GC4 governs the armed conflict between the United States and Iraq because the conflict is one between "High Contracting Parties" under article 2(1). It also governs the U.S. occupation of Iraq, because the United States has occupied "the territory of a High Contracting Party" under article 2(2).[4] *Cf.* S.C. Res. 1483, ¶ 5, U.N. Doc. S/RES/1483

---

[1] The Hague Regulations do not apply to the United States' conflict with and occupation of Iraq *as a matter of treaty law* because Iraq is not a party to the Hague Convention. *See* Hague Regulations art. 2, 36 Stat. at 2290 ("The provisions contained in the Regulations referred to in Article 1, as well as in the present Convention, do not apply except between Contracting Powers, and then only if all the belligerents are parties to the Convention."); Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of the President Under Domestic and International Law To Make Fundamental Institutional Changes to the Government of Iraq* at 10 (Apr. 14, 2003) (stating that "the Hague Regulations do not expressly govern the U.S. conflict with Iraq"). But as the citations in the text make clear, article 42(1) of the Hague Regulations, which provides that occupation begins "when [territory] is actually placed under the authority of the hostile army," reflects customary international law.

[2] It is possible, either at present or in the future, that some areas in Iraq might not be sufficiently under the authority of the United States to satisfy this definition of "occupation." We have not been asked to address the geographic scope of the United States' "occupation" in this opinion, and our analysis applies only to the United States' conduct in those areas of Iraq that are "actually . . . under the authority" of the United States.

[3] Iraq acceded to the Geneva Conventions on February 14, 1956, without reservations. *See* 2 Peter H. Rohn, *World Treaty Index* 553, 555, 557, 558 (2d ed. 1983).

[4] Some commentators have argued that article 2(2) refers *only* to occupations that (in the language of article 2(2)) "meet[] with no armed resistance." *See, e.g.*, *The Geneva Conventions of 12 August 1949, Commentary, IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 21 (Jean S. Pictet ed., International Committee of the Red Cross 1958) ("ICRC Commentary on GC4") (arguing that article 2(2) refers only to occupations that have occurred "without a declaration of

(May 22, 2003) (calling upon "all concerned [in Iraq] to comply fully with their obligations under international law including in particular the Geneva Conventions of 1949 and the Hague Regulations of 1907").

## B. Armed Conflict With al Qaeda

The United States is also engaged in an armed conflict with al Qaeda. *See* President's Military Order of November 13, 2001, § 1(a), 66 Fed. Reg. 57,833 ("International terrorists, including members of al Qaida, have carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict that requires the use of the United States Armed Forces."); Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons"); *Legality of the Use of Military Commissions to Try Terrorists*, 25 Op. O.L.C. 238, 260–61 (2001) (concluding that the President may properly determine that an "armed conflict" exists between the United States and al Qaeda.).

As we explain below, the drafters of the Geneva Conventions did not contemplate the possibility of an armed conflict between a State and an international non-State terrorist organization like al Qaeda. It is thus no surprise that, unlike the armed conflict with Iraq, the armed conflict with al Qaeda does not satisfy any of the article 2 prerequisites for the applicability of GC4. The President has previously determined that the conflict with al Qaeda does not satisfy article 2 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364 ("GPW") because "Al-Qaida is not a state party to the Geneva Convention; it is a foreign terrorist group." Office of the Press Secretary, The White House, *Fact Sheet: Status of Detainees at Guantanamo* (Feb. 7, 2002), *available at* http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html (last visited on Mar. 17, 2004). This determination under article 2 of GPW applies fully to the identically worded article 2 in GC4. Nonetheless, it is useful to review why the

---

war and without hostilities"); Adam Roberts, *What is a Military Occupation?*, 55 Brit. Y.B. Int'l L. 249, 253 (1984) (agreeing with ICRC). On this view, article 2(1) rather than article 2(2) would trigger the application of GC4 to occupations, like the one in Iraq, that grow out of an armed conflict, even though article 2(1) does not expressly refer to occupations following hostilities. *See* ICRC Commentary on GC4, *supra*, at 21 (arguing that article 2(1) applies to "cases in which territory is occupied during hostilities"); Roberts, *supra*, at 253 (agreeing). We need not decide whether this argument is valid. If it is, then the occupation of Iraq satisfies article 2(1) because it arose out of an armed conflict between contracting parties. If it is not, then the occupation of Iraq satisfies article 2(2) because, as stated in the text, it is an "occupation of the territory" of a contracting party.

armed conflict with al Qaeda does not satisfy article 2 and thus does not trigger the applicability of GC4.

The U.S.-al Qaeda armed conflict is not one "between two or more of the High Contracting Parties" within the meaning of article 2(1).[5] Al Qaeda has not signed or ratified GC4. Nor could it. Al Qaeda is not a State. Rather, it is a terrorist organization composed of members from many nations, with ongoing military operations in many nations. As a non-State entity, it cannot be a "High Contracting Party" to the Convention. *See* Bybee Memorandum, *supra* note 5, at 9. In addition, the U.S.-al Qaeda armed conflict has not resulted in the "occupation of the territory of a High Contracting Party" within the meaning of article 2(2). As a non-State actor, al Qaeda lacks any territory that could possibly be occupied. Finally, al Qaeda is not a "Power[] in conflict" that can "accept[] and appl[y]" GC4 within the meaning of article 2(3). *See, e.g.*, G.I.A.D. Draper, *The Red Cross Conventions* 16 (1958) (arguing that "in the context of Article 2, para. 3, 'Powers' means States capable then and there of becoming Contracting Parties to these Conventions either by ratification or by accession"); 2B *Final Record of the Diplomatic Conference of Geneva of 1949*, at 108 (explaining that article 2(3) would impose an "obligation to recognize that the Convention be applied to the non-Contracting adverse *State*, in so far as the latter accepted and applied the provisions thereof") (emphasis added) ("*Final Record*"); ICRC Commentary on GC4, *supra* note 4, at 23 (using "non-Contracting State" interchangeably with "non-Contracting Power" and "non-Contracting Party"). And in any event, far from embracing GC4 or any other provision of the law of armed conflict, al Qaeda has consistently acted in flagrant defiance of the law of armed conflict.[6]

In sum, applying article 2 to the two conflicts, considered independently, we conclude that GC4 applies to the United States' armed conflict with and occupation of Iraq but does not apply to its armed conflict with al Qaeda.

---

[5] Nor does the United States' conflict with al Qaeda implicate common article 3 of the Geneva Conventions, which governs "armed conflict[s] not of an international character occurring in the territory of one of the High Contracting Parties." As we have previously explained, common article 3 applies only to purely internal armed conflicts. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* at 10 (Jan. 22, 2002) ("Bybee Memorandum"). *See also infra* note 20.

[6] For example, on September 11, 2001, nineteen al Qaeda operatives wearing civilian clothes hijacked commercial airliners and used them as weapons to target and kill thousands of U.S. civilians. More generally, Osama bin Laden has declared a jihad against the U.S. government that instructed his followers to target American civilians as well as military personnel, without regard for international law. *See* World Islamic Front Statement, *Jihad Against Jews and Crusaders* (Feb. 23, 1998), *available at* http://www.fas.org/irp/world/para/docs/980223-fatwa.htm (last visited on Feb. 26, 2004).

## II. "Protected Persons" in Occupied Territory

Once GC4 is deemed to "apply" to the armed conflict with and occupation of Iraq under article 2, article 4 of GC4 defines a class of "[p]ersons protected by the Convention." "Protected person" status carries with it various protections set forth in part III of GC4.[7] In occupied territory, these protections relate to, among other things, detention, interrogation, trial, punishment, and deportation. *See, e.g.*, GC4 art. 76 ("Protected persons accused of offences shall be detained in the occupied country, and if convicted they shall serve their sentences therein."); *id.* art. 31 ("No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."); *id.* art. 33 ("No protected person may be punished for an offence he or she has not personally committed. Collective penalties and likewise all measures of intimidation or of terrorism are prohibited."); *id.* art. 49 ("Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, are prohibited, regardless of motive."). "Protected person" status under GC4 is not related to, and should not be confused with, "prisoner of war" ("POW") status under GPW. Most notably, a "protected person" under GC4 who commits an act of hostility against opposing forces does not receive the "belligerent's privilege" accorded to POWs who commit hostile acts against enemy forces before their capture. "Protected persons" can thus be tried, convicted, and (if appropriate) executed for such acts.

GC4's general definition of "protected persons" is set forth in article 4(1):

> Persons protected by the Convention are those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals.

The broad terms used in this definition suggest that persons located in the territory of occupied Iraq are "in the hands of" an occupying power and qualify for

---

[7] Individuals who are ineligible for "protected person" status under GC4 may still receive the protections under part II of GC4 that are not contingent on one's status as a "protected person." *See id.* art. 4(3) (noting that the "provisions of Part II [of GC4] are . . . wider in application, as defined in Article 13"). Specifically, part II, which includes articles 13–26, "covers the whole of the populations of the countries in conflict, without any adverse distinction based . . . on race, nationality, religion or political opinion." *Id.* art. 13. The protections in part II are primarily designed to protect persons from the adverse effects of hostilities, even in occupied territory. Among other things, part II concerns the establishment in occupied territory of hospitals and safety zones to shelter the wounded, the sick, children, young mothers, and the aged, *id.* arts. 14–15; requires belligerent parties to facilitate recovery of those killed or wounded, *id.* arts. 16–17; requires belligerent parties to protect civilian hospitals and related items and personnel, *id.* arts. 18–22; and confers some limited rights of communication upon the population of the occupied country, *id.* arts. 25–26.

"protected person" status so long as they "find themselves" there. *See* ICRC Commentary on GC4, *supra* note 4, at 47 ("The expression 'in the hands of' is used in an extremely general sense. . . . The mere fact of being in the territory of a Party to the conflict or in occupied territory implies that one is in the power or 'hands' of the Occupying Power."). GC4 then establishes various exceptions and qualifications to this definition of "protected person" based on geography, nationality, or protection by another Geneva Convention. We consider these exceptions and qualifications below.

### A. Geographical Limitation

To receive the protections provided for "protected persons," one must be located in either (1) "occupied territory," or (2) the "territory of a party to the conflict." This limitation does not emerge from article 4 itself, but rather from other provisions in GC4. Most notably, part III of GC4, which governs the "Status and Treatment of *Protected Persons*," *id.* (title) (emphasis added), confers protections only on "Aliens" who find themselves "*in the Territory of a Party to the Conflict*," *id.* pt. III, sec. II (title) (emphasis added), and persons who find themselves in "Occupied Territor[y]," *id.* pt. III, sec. III (title). *See also id.* pt. III, sec. I (title) (referring to "Provisions Common to the Territories of the Parties to the Conflict *and* to Occupied Territories") (emphasis added); *id.* pt. III, sec. IV (title) ("Regulations for the Treatment of Internees"); *id.* art. 79 (specifying that the "Internees" governed by part III, section IV consist of "protected persons" that have been interned pursuant to the provisions of articles 41, 42, or 43 (in the territory of a party to the conflict) or the provisions of articles 68 and 78 (in occupied territory)). Article 5 tends to confirm this territorial nexus. In limiting the protections available to otherwise "protected persons" engaged in activities hostile to the security of the State, article 5 speaks only about persons detained "in the territory of a Party to the conflict" or in "occupied territory." *Id.* art. 5(1), (2).[8]

The meaning of the phrase "territory of a Party to the conflict," considered in isolation, is not self-evident. At first glance, one might think that the phrase includes occupied territory, because the occupied power (to whom the territory belongs) is a party to the conflict. But in the context of the entire Convention, the phrase clearly refers to the *home territory* of the party to the conflict in whose hands the "protected person" finds himself. This is evident from several provisions in GC4. Part III of GC4 sets forth the requirements for the "treatment of protected

---

[8] Commentators agree that the protections accorded to "protected persons" exist only in the territory of a party to the conflict or in occupied territory. *See* ICRC Commentary on GC4, *supra* note 4, at 45–46; Richard R. Baxter, *So-Called "Unprivileged Belligerency": Spies, Guerrillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. 323, 328 (1951); Raymund T. Yingling & Robert W. Ginnane, *The Geneva Conventions of 1949*, 46 Am. J. Int'l L. 393, 411 (1952); John Embry Parkerson, Jr., *United States Compliance with Humanitarian Law Respecting Civilians During Operation Just Cause*, 133 Mil. L. Rev. 31, 74 (1991).

persons," and its provisions clearly demonstrate that the "territory of a party to the conflict" does not include "occupied territor[y]." First, part III of GC4 separates provisions governing the "Territory of a Party to the Conflict" from those governing "Occupied Territor[y]." *See id.* pt. III, sec. II (title) ("Aliens in the Territory of a Party to the Conflict"); *id.* pt. III, sec. III (title) ("Occupied Territor[y]"). *See also id.* pt. III, sec. I (title) (referring to "Provisions Common to the Territories of the Parties to the Conflict *and* to Occupied Territories") (emphasis added). In addition, the rules that govern the "territory of a party to the conflict" are very difficult to reconcile with the obligations imposed on an occupying power by section III. Article 49(1), which is included in part III, section III's rules for "Occupied Territories," generally prohibits "forcible transfers, as well as deportations" of "protected persons."[9] The provisions of part III, section II, by contrast, envision considerably more latitude in removing "protected persons" found in the "territory of a party to the conflict." *See, e.g.*, *id.* art. 45(3) ("Protected persons *may be transferred* by the Detaining Power only to a Power which is a party to the present Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the present Convention.") (emphasis added); *id.* art. 45(5) ("The provisions of this Article do not constitute an obstacle to the extradition, in pursuance of extradition treaties concluded before the outbreak of hostilities, of protected persons accused of offences against ordinary criminal law."). So any uncertainty about the phrase "territory of a party to the conflict" is eliminated by consideration of the clear distinctions drawn in the first three sections of part III.[10]

In sum, the protections afforded to "protected persons" by GC4 apply only to persons who "find themselves" in occupied territory or in the home territory of a party to the conflict.

## B. Citizens of the Occupying Power

The general definition of "protected person" in article 4(1) by its terms does not extend to persons who "find themselves . . . in the hands of" an occupying power that is the State of their nationality. In the context of U.S. obligations in occupied Iraq, this means that U.S. citizens in the hands of the U.S. government are not

---

[9] Article 49(2) provides a limited exception to this rule:

> Nevertheless, the Occupying Power may undertake total or partial evacuation of a given area if the security of the population or imperative military reasons so demand. Such evacuations may not involve the displacement of protected persons outside the bounds of the occupied territory except when for material reasons it is impossible to avoid such displacement. Persons thus evacuated shall be transferred back to their homes as soon as hostilities in the area in question have ceased.

[10] This point is so obvious that commentators assume it without discussion. *See, e.g.*, ICRC Commentary on GC4, *supra* note 4, at 61–62; Yingling & Ginnane, *supra* note 8, at 417; Parkerson, *supra* note 8, at 73–74.

"protected persons." Despite this exception to "protected person" status, article 70(2) of GC4 provides:

> Nationals of the occupying Power who, before the outbreak of hostilities, have sought refuge in the territory of the occupied State, shall not be arrested, prosecuted, convicted or deported from the occupied territory, except for offences committed after the outbreak of hostilities, or for offences under common law committed before the outbreak of hostilities which, according to the law of the occupied State, would have justified extradition in time of peace.

U.S. nationals captured in Iraq who satisfy the requirements of article 70 receive its limited protections.

### C. Nationals of a Non-Signatory State

Article 4(2) provides that "[n]ationals of a State which is not bound by" GC4 are not "protected persons." Almost every State in the world has ratified GC4. At present, we are aware of only two States that have not: the Marshall Islands and Nauru. *See* Office of the Legal Adviser, Dep't of State, *Treaties in Force* 456–57 (2003) (listing States-Parties to the Geneva Conventions). In occupied Iraq, citizens of these States who "find themselves . . . in the hands of" the United States will not be "protected persons," unless and until their State of citizenship agrees to be bound by GC4.

### D. Nationals of a Co-Belligerent State

Article 4(2) further excludes from "protected person" status "nationals of a co-belligerent State" that has "normal diplomatic representation in the State in whose hands they are." GC4 does not define the term "co-belligerent." At the time the Convention was being drafted, the term "belligerent" was commonly used to "designate[] either of two nations which are actually in a state of war with each other, as well as their allies actively co-operating, as distinguished from a nation which takes no part in the war and maintains a strict indifference as between the contending parties, called a 'neutral.'" *Black's Law Dictionary* 197 (4th ed. 1951); *see also* 1 *Oxford English Dictionary* 787 (1933) (defining "belligerent" as "[a] nation, party, or person waging regular war (recognized by the law of nations)."). The addition of the prefix "co-" distinguishes, in broad terms, allies from enemies. *See* ICRC Commentary on GC4, *supra* note 4, at 49 (stating that "co-belligerent[s]" and "allies" are synonyms); Michael Bothe et al., *New Rules for Victims of Armed Conflicts* 440 (1982) (characterizing article 4's reference to "co-belligerents" as a reference to "allies"). This usage is consistent with a prominent episode during World War II. In 1943, when Italy surrendered to the allies and declared war on Germany, it was formally accepted as "a co-belligerent [with the

United States, Great Britain, and the Soviet Union] in the war against Germany." Statement by the President of the United States, the Prime Minister of Great Britain, and the Premier of the Soviet Union on Italy's Declaration of War, *reprinted in* 1943 U.S. Naval War College, *International Law Documents* 92 (1945).

The status of belligerency is not always easy to establish, however, because GC4 does not require that a state of armed conflict be formally "recognized" by the States involved. *See* GC4 art. 2(1). Because belligerent States are defined in contrast with neutral ones, neutrality law may provide guidance in determining when a State has become a co-belligerent. To remain neutral, a State must not actively participate in hostilities and (with exceptions not relevant here) must not permit its territory to be used by belligerents as a sanctuary or base of operations. *See, e.g.*, Michael Bothe, *The Law of Neutrality*, *in The Handbook of Humanitarian Law in Armed Conflicts* ¶ 1109, at 495 (Dieter Fleck ed., 1999) (a neutral State "must prevent any attempt by a party to the conflict to use its territory for military operations"); *id.* ¶ 1111, at 497 ("If the neutral state takes part [in acts of war by a party to the conflict] by engaging its own military forces, this is a clear example" of forbidden assistance.); Yoram Dinstein, *War, Aggression and Self-Defence* 23-28 (3d ed. 2001) (similar). Prior U.S. practice is consistent with the conclusion that a country becomes a co-belligerent when it permits U.S. armed forces to use its territory for purposes of conducting military operations.[11]

For these reasons, the exception to "protected person" status for nationals of "co-belligerent[s]" in article 4 includes, at a minimum, nationals of countries that send military forces to participate in Coalition combat operations or that allow their territory to be used as a base for such operations. Applying this definition to Iraq, we conclude, based on information currently available to us, that the United Kingdom, Australia, Spain, Poland, Kuwait, and Qatar are "co-belligerent[s]" within the meaning of article 4.[12] This list is not meant to exclude other States that

---

[11] In 1970, President Nixon ordered U.S. forces in Vietnam to cross the border into Cambodia to attack bases that—despite Cambodia's professions of neutrality—were being used by North Vietnamese and Viet Cong forces. The State Department Legal Adviser explained that the United States affirmatively decided not to secure the "advance, express request of the Government of Cambodia for our military actions on Cambodian territory," because that level of cooperation would have "compromised the neutrality of the Cambodian Government" and the United States "did not wish to see Cambodia become a co-belligerent along with South Viet-Nam and the United States." *Military Operations in Cambodia*, 64 Am. J. Int'l L. 932, 935 (1970). President Nixon himself made the same point in connection with the simultaneous decision to provide equipment for the Cambodian Army. *See* Address to the Nation on the Situation in Southeast Asia, *Pub. Papers of Pres. Richard Nixon* 405, 407 (Apr. 30, 1970) ("[T]he aid we will provide will be limited for the purpose of enabling Cambodia to defend its neutrality and not for the purpose of making it an active belligerent on one side or the other.").

[12] There should be no dispute that each of these States "has normal diplomatic representation" in the United States. GC4 art. 4(2). Each of them maintains an embassy in Washington, D.C., and (although this is not required by the text of article 4) the United States also maintains an embassy in each of their capitals.

may be in a similar position; it merely reflects the information currently available to this Office.

As for States that did not participate in actual combat operations in Iraq but that subsequently play some role in the occupation of Iraq, we have not located authority or analysis regarding the level of participation in an occupation that suffices to trigger "co-belligerent" status under GC4. We believe, however, that mere participation in any aspect of the occupation itself will not always suffice to constitute co-belligerency, especially when a State's specific contribution has no direct nexus with belligerent or hostile activities. For instance, if a State merely assists the Coalition in fulfilling the requirement under article 50(1) of GC4 to "facilitate the proper working of all institutions devoted to the care and education of children," it would not be a belligerent. But a State that sends military forces to assist in rounding up Baathist remnants and imposing general security in Iraq, and especially one that participates in hostile activities in Iraq, will engage in conduct properly characterized as belligerent. In sum, the determination whether a State is a "co-belligerent" by virtue of its participation in the occupation of Iraq turns on whether the participation is closely related to "hostilities."

### E. Nationals of a Neutral State in the Territory of a Belligerent State

Article 4(2) also excludes from "protected person[]" status nationals "of a neutral State who find themselves in the territory of a belligerent State," as long as the neutral State has "normal diplomatic representation in the State in whose hands they are." The phrase "territory of a belligerent State" might appear at first to be capable of bearing two different readings. First, it might refer to the territory of any State that participates in an armed conflict covered by GC4. As applied to the armed conflict with Iraq, this interpretation would mean that citizens of neutral States in occupied Iraq would not be "protected persons" so long as the neutral States had "normal diplomatic representation" in the United States. Second, "territory of a belligerent State" might refer to the *home* territory of the party to the conflict in whose hands the citizen of the neutral State finds himself. As applied to the armed conflict with Iraq, this interpretation would deny "protected person[]" status to citizens of neutral States who find themselves in the territory of the United States, but not to those who find themselves in occupied Iraq.

We conclude that the second interpretation is correct. The phrase "[n]ationals of a neutral State who find themselves in the territory of a belligerent State" must be understood in light of the Convention's overarching structure. As noted earlier, the specific protections that the Convention confers on "protected persons" apply in only two places: in occupied territory, or in the home territory of a party to the conflict. *See supra* Part II.A. If "territory of a belligerent State" were construed to include occupied territory as well as the home territory of a party to the conflict, nationals of neutral States would not enjoy GC4's protections *anywhere in the world*. Interpreting "territory of a belligerent State" to include occupied territory

would thus render this phrase effectively meaningless. Such a construction is disfavored. *See, e.g.*, *Factor v. Laubenheimer*, 290 U.S. 276, 303–04 (1933) (treaties should not be interpreted to render phrases "meaningless or inoperative").

It is true that article 4 uses the phrase "territory of a belligerent State," while the other provisions of GC4 employ the term "territory of a party to the conflict" when referring to home territory. Where drafters use different terms in the same treaty, they are ordinarily presumed "to mean something different." *See Air France v. Saks*, 470 U.S. 392, 397–98 (1985). But in this context, we do not think the variation in language indicates a different meaning. It is easy to construe the phrases "territory of a belligerent State" and "territory of a party to the conflict" as synonyms. Every "party to the conflict" is a "belligerent State," and every "belligerent State" is a "party to the conflict." More importantly, if we were to read the phrase "territory of a belligerent State" to include occupied territory, the qualifying phrase would be entirely superfluous, and indeed would be contrary to the treaty's apparent intention to narrow the exclusion from "protected person" status to a subset of citizens of neutral States.

The negotiating record confirms this meaning of "territory of a belligerent State." *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) (stating that a treaty's negotiating record "may of course be consulted to elucidate a text that is ambiguous"). Two aspects of this record make clear that the phrase "territory of a belligerent State" in article 4(2) means "the home territory of a party to the conflict."

First, the delegates treated the phrases "territory of a belligerent State" and "territory of a Party to the conflict" as synonyms. A proposed draft of article 3A (which later became article 5) began: "Where in the territory of a belligerent, the Power concerned is satisfied that an individual protected person is definitely suspected of or engaged in activities hostile to the security of the State . . . ." 3 *Final Record* at 100. This text was later changed to replace "territory of a belligerent" with "territory of a Party to the conflict." Although draft article 3A was hotly debated throughout the Convention, none of the delegates reacted in any manner suggesting that the change in language altered the scope of the original article 3A.

Second, and more broadly, the drafting history reveals that the delegates fully understood that nationals of neutral States would have "protected person" status in occupied territory. The Rapporteur who introduced the draft of article 3 (which later became article 4), Col. Du Pasquier (Switzerland), said:

> A particularly delicate question was that of the position of the na-
> tionals of neutral States. The Drafting Committee had made a dis-
> tinction between the position of neutrals in the home territory of bel-
> ligerents and that of neutrals in occupied territory. In the former case,
> neutrals were protected by normal diplomatic representation; in the
> latter case, on the other hand, the diplomatic representatives con-

> cerned were only accredited to the Government of the occupied States, whereas authority rested with the Occupying Power. It followed that all neutrals in occupied territory must enjoy protection under the Convention, while neutrals in the home territory of a belligerent only required such protection if the State whose nationals they were had no normal diplomatic representation in the territory in question.

2A *Final Record* at 793. Not a single delegate questioned or challenged Du Pasquier's interpretation of article 4's text, or his rationale as to why nationals of neutral States should receive "protected person" status in occupied territory.[13]

For these reasons, we conclude that nationals of neutral States are not per se excluded from "protected person" status in occupied Iraq.[14]

## F. Persons Protected by Another Geneva Convention

Article 4(4) provides:

> Persons protected by the Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field of August 12, 1949, or by the Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members

---

[13] A U.S. delegate, Mr. Ginnane, additionally explained that the United States did not want nationals of neutral States to be protected in its home territory: "[I]n the United States of America and in various other countries a large section of the population was composed of aliens who were permanently settled in its territory. In the United States those persons considered themselves as an integral part of the country, and in time of war were treated in practically all respects as American citizens. Their children were brought up as citizens of the United States. Such persons had no need of protection under the Convention." 2A *Final Record* at 794. The Drafting Committee agreed and crafted article 4 to remove protections from nationals of neutral States only when they find themselves in the home territory of a party to the conflict. *Id*.

[14] Most commentators agree with our interpretation of the phrase "territory of a belligerent State" in article 4(2). *See, e.g.*, Yingling & Ginnane, *supra* note 8, at 411 (1952); ICRC Commentary on GC4, *supra* note 4, at 46; Joyce A.C. Guttheridge, *The Geneva Conventions of 1949*, 26 Brit. Y.B. Int'l L. 294, 320 (1949); Morris Greenspan, *The Modern Law of Land Warfare* 157–58 (1959); 2 Howard S. Levie, *The Code of International Armed Conflict* 798 (1986); Vaughn A. Ary, *Concluding Hostilities: Humanitarian Provisions in Cease-Fire Agreements*, 148 Mil. L. Rev. 186, 238 (1995); Theodor Meron, *Prisoners of War, Civilians and Diplomats in the Gulf Crisis*, 85 Am. J. Int'l. L. 104, 106 (1991); Parkerson, *supra* note 8, at 110 (1991). We have discovered three commentators who, to the contrary, have suggested in passing that nationals of neutral countries in occupied territory are not "protected persons." *See* Hans-Peter Gasser, *Protection of the Civilian Population*, *in The Handbook of Humanitarian Law in Armed Conflicts* 241 (Dieter Fleck ed., 1999); Gerhard von Glahn, *The Occupation of Enemy Territory: A Commentary on the Law and Practice of Belligerent Occupation* 91 (1957); Jordan J. Paust, *Judicial Power to Determine the Status and Rights of Persons Detained Without Trial*, 44 Harv. Int'l L.J. 503, 512 n.29 (2003). These commentators provide no analysis in support of their assertions concerning the meaning of "territory of a belligerent State," and we thus find no basis in their statements for questioning the construction outlined above.

of Armed Forces at Sea of August 12, 1949, or by the Geneva Convention relative to the Treatment of Prisoners of War of August 12, 1949, shall not be considered as protected persons within the meaning of the present Convention.

This provision excludes persons who enjoy protection under one of the other three Geneva Conventions from claiming "protected person" status under GC4. Such persons are excluded because they receive different protections appropriate to their particular status under other Conventions.

### G. Unlawful Combatants

GC4's full title—"Geneva Convention Relative to the Protection of *Civilian* Persons in Time of War," (emphasis added)—suggests that "[t]he main object of the Convention is to protect a strictly defined category of *civilians*." ICRC Commentary on GC4, *supra* note 4, at 10 (emphasis added). Consistent with this title, article 4(4) of GC4 expressly excludes lawful combatants who enjoy POW status from "protected person" status. These factors, combined with the fact that unlawful combatants generally receive less favorable treatment than lawful combatants under the Geneva Convention system, *see, e.g.*, *Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949*, 26 Op. O.L.C. 1 (2002) (concluding that GPW withholds protections from persons who engage in hostilities but fail to satisfy criteria for lawful combatancy), might lead one to assume that unlawful combatants are categorically excluded from "protected person" status under GC4.

GC4's text, however, contemplates that persons who "find themselves" in occupied territory within the meaning of article 4 may engage in at least some forms of unlawful belligerency without forfeiting all of the benefits of "protected person" status. Article 5(2), for example, provides that "an individual protected person" detained in occupied territory "as a spy or saboteur, or as a person under definite suspicion of activity hostile to the security of the Occupying Power" does not forfeit all GC4 protections. Rather, such persons forfeit only their "rights of communication," and then only when "absolute military security so requires." *Id.* art. 5(2). While the scope of conduct contemplated by the phrase "activity hostile to the security of the Occupying Power" is not entirely clear,[15] spies and saboteurs, at least, are unlawful combatants. *See Ex parte Quirin*, 317 U.S. 1, 30–31 (1942). In like manner, article 68 provides that the occupying power "may impose the death penalty on a protected person only in cases where the person is guilty of

---

[15] Presumably it should be understood to refer to activities similar to espionage and sabotage. *See, e.g.*, *Norfolk & W. Ry. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.").

espionage, of serious acts of sabotage against the military installations of the Occupying Power or of intentional offences which have caused the death of one or more persons." GC4 art. 68. This provision appears to preserve the procedural and substantive trial protections conferred by articles 69–78 of GC4 for at least some types of unlawful combatants who are otherwise "protected persons" under article 4.

GC4's negotiating record confirms that at least some forms of unlawful belligerency are not inconsistent with "protected person" status. The original draft of GC4 (the Stockholm text) did not contain any provision akin to article 5. This omission prompted many delegations to express concern that a State engaged in an armed conflict or occupation would be left without "sufficient protection against spies, saboteurs and traitors," 2A *Final Record* at 796 (summary of statement of Col. Hodgson (Australia)), and that without a provision like article 5, the Convention "would in certain cases jeopardize the very security of the State," *id*. Such concerns would not have been raised if the original draft had been understood wholly to exclude these sorts of unlawful belligerents from GC4's protections. The Drafting Committee responded to these concerns by proposing a new draft article 3A (which ultimately became article 5). The Rapporteur, Colonel Du Pasquier (Switzerland), "explained that internal security was one of the main preoccupations of national leaders in time of war," and that article 3A had been drafted "in order to guard against [the] danger" that "the protection given by the Convention should . . . facilitate the subversive activities of 'fifth columnists.'" 2A *Final Record* at 796. Though some delegations opposed draft article 3A, *see* 2A *Final Record* at 796–97; 2B *Final Record* at 384, none expressed the view that it was unnecessary because persons who engaged in any form of unlawful belligerency were categorically excluded from "protected person" status under GC4.[16]

We thus conclude that at least some unlawful belligerents can fall within the scope of persons who are "protected" under GC4 so long as they "find themselves" in occupied territory within the meaning of article 4.[17]

---

[16] Similarly, in a discussion of then-article 3 (which became article 4), the United Kingdom's delegate stated that the definition of "protected persons" would "cover individuals participating in hostilities in violation of the laws of war," and urged that then-article 3 be amended to ensure that "[c]ivilians who violated [the laws of war] should cease to be entitled to the treatment provided for law-abiding citizens." 2A *Final Record* at 620–21. No delegate disputed the United Kingdom's interpretation of then-article 3, but ultimately no amendments were made to article 3 in response to the United Kingdom's concerns.

[17] Numerous commentators conclude that unlawful combatants are not per se excluded from "protected person" status under GC4. *See, e.g.*, Albert J. Esgain & Col. Waldemar A. Solf, *The 1949 Geneva Convention Relative to the Treatment of Prisoners of War: Its Principles, Innovations, and Deficiencies*, 41 N.C. L. Rev. 537, 549 (1962–1963); Baxter, *supra* note 8, at 328; Frits Kalshoven, *Constraints on the Waging of War* 41 (1991); G.I.A.D. Draper, *The Status of Combatants and the Question of Guerilla Warfare*, 45 Brit. Y.B. Int'l L. 173, 193 (1971). Some commentators reach this conclusion by endorsing the view, expressed in the ICRC's Commentary, that "[e]very person in enemy hands must have some status under international law: he is either a prisoner of war and, as such,

### III. Al Qaeda Operatives in Occupied Iraq

We now turn to the status of al Qaeda operatives captured in occupied Iraq.[18]

### A. The Interpretive Problem

To say that at least some unlawful combatants may be "protected persons" in occupied territory is not to say that all unlawful combatants captured in Iraq—and in particular al Qaeda terrorist operatives captured there—enjoy this status. GC4 does not expressly address the status of operatives of an international terrorist organization. Whether such terrorists possess "protected person" status therefore depends on whether they fall within the scope of article 4(1), which confines such status to "those who, at a given moment and in any manner whatsoever, *find themselves*, in the case of . . . occupation, in the hands of [an] . . . Occupying Power of which they are not nationals" (emphasis added).

Article 4's use of the phrase "find themselves" is somewhat unusual and creates an ambiguity in the text. Some have read this phrase broadly, to include within the "protected persons" described in article 4(1) all persons physically present in occupied territory. *See, e.g.*, *Affo v. Commander Israel Defence Force in the West Bank*, 29 I.L.M. 139, 152 (1990) (concluding that "'protected persons' . . . em-

---

covered by the Third Convention, a civilian covered by the Fourth Convention, or again, a member of the medical personnel of the armed forces who is covered by the First Convention. *There is no* intermediate status; nobody in enemy hands can be outside the law." ICRC Commentary on GC4, *supra* note 4, at 51 (emphasis in original). *See, e.g.*, Paust, *supra* note 14, at 511–12 & n.27; Laura A. Dickinson, *Using Legal Process to Fight Terrorism: Detentions, Military Commissions, International Tribunals, and the Rule of Law*, 75 S. Cal. L. Rev. 1407, 1425 & n.92 (2002). But this is clearly not what the Geneva Conventions provide. Many non-POWs "in enemy hands" will fail to qualify for rights accorded to "protected persons" under GC4, including (a) persons who are nationals of a State that is not bound by the Convention, *see* GC4 art. 4(2); (b) persons who have taken up arms against their country of citizenship, *see* GC4 art. 4(1); (c) persons who have taken up arms against a co-belligerent of their country of citizenship, *see* GC4 art. 4(2); and (d) persons who were not captured in either the "territory of a party to the conflict" or in "occupied territory," *see* GC4 pt. III, secs. I–III; *supra* Part II.A. The commentators who endorse the ICRC Commentary make no effort to reconcile the Commentary's aspiration with these undisputable exclusions from GC4's protections. So while we recognize that at least some types of unlawful combatants can have "protected person" status under GC4, we reject the ICRC Commentary's mischaracterization of article 4.

[18] In discussing "al Qaeda operatives," we refer not only to individuals who are formal members of al Qaeda, but also to those who have associated themselves with that organization and are fighting on its behalf. *Cf. Ex parte Quirin*, 317 U.S. 1, 37–38 (1942) ("Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of the Hague Convention and the law of war."). Our analysis would also apply to members or associates of other terrorist organizations that are sufficiently connected to al Qaeda that they may be deemed participants in its armed conflict against the United States, as well as to members or associates of terrorist organizations that are not so connected to al Qaeda but are separately engaged in global armed conflict against the United States. For purposes of this opinion, we do not attempt to articulate a precise test for identifying such associates or organizations.

braces . . . all persons found in the territory," including infiltrators who are there illegally); *cf., e.g.*, Yingling & Ginnane, *supra* note 8, at 411 (1952) (implicitly taking this position). Under this interpretation, those who "find themselves" in occupied territory are simply those who "are" in occupied territory, and al Qaeda operatives in occupied Iraq would be "protected persons" under GC4 unless they fall within article 4's limited nationality exclusions. While "are" may be a possible reading of "find themselves," it is not the only, or even a particularly obvious, reading of that phrase. Had article 4's drafters intended this meaning, they could have readily conveyed it with terminology far simpler and clearer than the phrase "find themselves."

Alternatively, the phrase "find themselves" can be read more narrowly to suggest an element of happenstance or coincidence, and to connote a lack of deliberate action relating to the circumstances that leave the persons in question in the hands of an occupying power. This reading of the phrase is both common and natural. *See, e.g.*, 4 *Oxford English Dictionary* 224 (1933) (defining "find" as "to come upon by chance or in the course of events"); *Funk & Wagnalls New Standard Dictionary of the English Language* 923 (1946) (defining "find" as "to discover or meet with by accident; chance upon; fall in with"). On this narrower reading, al Qaeda operatives in occupied Iraq do not, as a general matter, "find themselves" in that country. Such persons are in Iraq as willing agents of an international terrorist organization engaged in global armed conflict against the occupying powers. Their presence in occupied territory, accordingly, can hardly be attributed to happenstance or coincidence.

This reading of article 4 accords with ordinary usage: one would not say that a terrorist who hijacks an airplane "finds himself" on a hijacked airliner. His presence on the hijacked plane is surely not attributable in any way to happenstance or coincidence; he is there to carry out the hijacking. By contrast, one would say that innocent passengers "find themselves" aboard the hijacked flight. Although their presence on the hijacked plane is in some sense deliberate (presumably they chose to travel on that particular flight), it is accidental or *co*-incidental at least in the sense that it results from factors unrelated to the hijacking. This reading of "find themselves" closely corresponds to the position recognized by one Justice of the Israeli Supreme Court in *Affo*, 29 I.L.M. at 180 (Bach, J., concurring in judgment) (acknowledging that those who "find themselves" in occupied territory could be limited to those who have "fallen into a situation where against their will they find themselves in the hands of one of the parties to the conflict or in the hands of the occupying power; whereas people who subsequently penetrate into that territory with malicious intent are not included in that definition"). It has also been suggested by at least one commentator. *See* Brian Farrell, *Israeli Demolition of Palestinian Houses as a Punitive Measure: Application of International Law to Regulation 119*, 28 Brook. J. Int'l L. 871, 922 n.384 (2003) (noting

the possibility that certain persons in occupied territory do not "'find themselves' in the hands of the occupying power as contemplated by Article 4").[19]

Although article 4 can be read to exclude al Qaeda operatives from the class of "protected persons," we must acknowledge that article 4 could also be read to include such persons. This ambiguity, and GC4's more general failure to specifically address the status of international terrorist organization operatives in occupied territory, are not surprising. The Geneva Conventions were drafted at a time when conflicts between States were the only transnational armed conflicts that could have been imagined. The 1949 Diplomatic Conference of Geneva occurred in the aftermath of World War II, when States were the sole entities with the organization, discipline, and resources capable of engaging in transnational wars. GC4's State-centric orientation is clearly reflected in article 2, which limits the applicability of the Geneva Conventions to armed conflicts between States, and occupations of the territory of States, that have either ratified, or else accepted and applied, the Conventions. *See supra* Part I.B.[20]

Because article 4's application in this context is ambiguous, we turn to other sources for interpretive guidance. *See Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534–35 (1991) (providing that although treaty interpretation "begin[s] with the text of the treaty . . . , [o]ther general rules of construction may be brought to bear on difficult or ambiguous passages") (internal quotation marks and citations omitted); Vienna Convention on the Law of Treaties art. 32, *opened for signature*

---

[19] As we noted, Article 4 extends "protected person" status to all "those who, *at a given moment and in any manner whatsoever*, find themselves . . . in the hands of [an] . . . Occupying Power of which they are not nationals" (emphasis added). The prepositional phrase "at a given moment and in any manner whatsoever" modifies "find themselves" and therefore has no application or relevance to persons who do not "find themselves" in the hands of an Occupying Power. Thus, the meaning of "at a given moment and in any manner whatsoever" does not inform or expand, but instead depends upon and is limited by, "find themselves." Accordingly, we do not believe this prepositional phrase provides meaningful guidance in choosing between the broad and narrow readings of "find themselves."

[20] To be sure, common article 3 of GC4 contemplates that a State and non-State actors can engage in an armed conflict "not of an international character" that occurs "in the territory of one of the High Contracting Parties." *See* Geneva Conventions I–IV, art. 3. But common article 3 confirms that there was no contemplation of non-State terrorist organizations carrying on a global war. It establishes minimal protections of humane treatment for persons involved in conflicts *purely internal to a State*, such as civil wars and related domestic insurgency movements. *See* Bybee Memorandum, *supra* note 5, at 10. The GC4 drafters agreed to common article 3 after a lengthy debate that focused on concerns about the implications of conferring even minimal legal protections on non-State groups in a purely domestic context. *See, e.g.*, 2B *Final Record* at 325 (Soviet delegate Mr. Morosov) ("No other issue has given rise to such a long discussion and to such a detailed and exhaustive study as the question of the extension of the Convention to war victims of conflicts not of an international character."). The creation of such protections—which fall far short of those conferred on "protected persons" by article 4— "mark[ed] a new step forward," and represented "an almost unhoped-for extension" of international law at the time. *See* ICRC Commentary on GC4, *supra* note 4, at 26. This limited extension, after elaborate discussion, of minimal protections for non-State actors in purely internal armed conflict further confirms that the drafters of GC4 did not contemplate the possibility of full "protected person" status for members of a non-State actor terrorist organization engaged in transnational armed conflict.

May 23, 1969, 1155 U.N.T.S. 331, 340 ("Recourse may be had to supplementary means of interpretation . . . to determine the meaning when [textual] interpretation according to article 31 . . . leaves the meaning ambiguous or obscure . . . .").[21] Resort to extrinsic sources is especially appropriate where, as here, ambiguity results from changed or unforeseen circumstances. In such instances, "it is our responsibility to give the specific words of the treaty a meaning *consistent with the shared expectations of the contracting parties*." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999) (quoting *Air France v. Saks*, 470 U.S. 392, 399 (1985)) (emphasis added). *See also Rocca v. Thompson*, 223 U.S. 317, 331–32 (1912) (observing that treaties "[l]ike other contracts . . . are to be read in the light of the conditions and circumstances existing at the time they were entered into with a view to effecting the objects and purposes of the States thereby contracting").

### B. The Benefits-Burdens Principle of the Fourth Geneva Convention

We first consider article 4's textual ambiguity in light of the objects and purposes of the Geneva Conventions, including GC4. It is well established, both in United States and international practice, that interpretations of ambiguous treaty text should, if possible, accord with such purposes. *See Rocca*, 223 U.S. at 331–32; Vienna Convention art. 31.1, 1155 U.N.T.S. at 340 ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and *in the light of its object and purpose*.") (emphasis added). One object and purpose of the Geneva Conventions is to exclude from coverage those who engage in transnational armed conflict, even in occupied territory, if their representatives have rejected the burdens of the Geneva Convention system.

This "benefits-burdens" principle finds several expressions in the text of GC4. For example, article 2(1) of GC4 limits the application of the Convention to armed conflicts between High Contracting Parties. Common article 2(1) expresses the principle that entities engaged in armed conflict do not receive Geneva Convention protections unless they also accept the Conventions' burdens. Article 2(3) similarly reflects a benefits-burdens constraint. It provides that if a "Power[] in conflict" that is not a signatory to GC4 "accepts and applies" GC4, then any signatory State involved in the conflict with that power will be "bound by the Convention" with regard to that "Power." Article 2(3) further states that if one of the "Powers in conflict" is a non-party to GC4, the "Powers who are parties thereto

---

[21] Although the United States is not a signatory to the Vienna Convention, it has recognized that articles 31 and 32 of the Vienna Convention reflect international practice. *See* Bybee Memorandum, *supra* note 5, at 23. Courts also frequently rely on articles 31 and 32 to interpret treaties. *See, e.g.*, *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n.40 (11th Cir. 1999); *Kreimerman v. Casa Veerkamp S.A. de C.V.*, 22 F.3d 634, 638 n.9 (5th Cir. 1994).

shall remain bound by it in their mutual relations." This provision contemplates that even when signatories and non-signatories fight together, signatories owe duties under GC4 only to other signatories, or to those "Powers" that have agreed to accept and apply the Convention. Common article 2(3) makes clear that, though the drafters of the Geneva Conventions did not insist on the formalities of treaty signature and ratification, they did insist that a warring "Party" must accept the burdens of the Conventions, even if somewhat informally, in order to receive their benefits.

The benefits-burdens principle also finds expression in article 4(2), which provides: "Nationals of a State which is not bound by the Convention are not protected by it." The ICRC's official Commentary states that article 4(2)'s exception to the definition of "protected person" in article 4(1) is a "truism" and an "unnecessary addition" that follows naturally from article 2(1) even in the absence of article 4(2). ICRC Commentary on GC4, *supra* note 4, at 48. Whether or not this is true, article 4(2) makes this much clear: persons in occupied territory, including those who commit hostile acts there, are not "protected persons" under GC4 if the State that represents them has not formally accepted the Convention's burdens.

This principle stands out with clarity against the background of GC4's otherwise very broad reach. Recall that GPW limits POW status, and thus the benefits of GPW, to the lawful combatants of armed forces and related forces of States that are parties to the conflict and have ratified GPW, and thus that have accepted obligations regarding the conduct of armed conflict. By contrast, GC4 casts its net much wider, extending "protected person" status in occupied territory to persons who have no connection to the armed conflict (such as nationals of neutral States) and thus who have no obligations related to the conflict. Even in the context of GC4's expansive application, however, the drafters were careful to exclude from "protected person" status individuals from States that had not signed the Convention or otherwise accepted and applied its provisions in the relevant conflict.

In sum, articles 2 and 4 reflect the Geneva Conventions' principle that persons who engage in transnational armed conflicts do not receive the benefits of the Conventions, in occupied territory or otherwise, if their representatives refuse to accept their burdens. GC4 usually expresses this benefits-burdens principle in terms of *nationals* of *States* that have ratified the Convention. Specifically, GC4 generally provides that nationals of States that fail to assume the burdens of GC4 do not receive its benefits, even in occupied territory. This formulation reflects the drafters' assumptions that States would be the only entities capable of engaging in a transnational armed conflict, and that denying "protected person" status to nationals of non-compliant States would adequately ensure that all warring entities accepted GC4's burdens before receiving its benefits.

But the assumption that persons would *only* be identified with States—because States are the only entities that take part in transnational conflicts—does not hold true in the unprecedented context of a global armed conflict in which the armed

forces of a non-State terrorist organization attack a State in territory occupied in connection with an armed conflict between signatory States. Adherence to article 4's State-centric presuppositions in this context would violate GC4's fundamental principle that warring entities cannot receive the benefits of GC4 if they reject Geneva Convention duties. Al Qaeda has pointedly declined to accept or apply GC4 or any other principle of the law of armed conflict. If nationals of a rogue State that refused to be bound by the Geneva Conventions engaged in unlawful belligerency on behalf of that rogue State, they would be denied "protected person" status everywhere in the world, including occupied Iraq. *See* GC4 art. 4(2) ("Nationals of a State which is not bound by the Convention are not protected by it."). It would run sharply contrary to the object and purpose of GC4 to give al Qaeda operatives a more elevated status than such individuals. The conferral of such elevated status would allow a non-State terrorist organization to circumvent GC4's benefits-burdens principle by using territory occupied in a war between two signatory States as the most advantageous place to carry on their conflict against the occupying power. The sounder approach is to adhere to the benefits-burdens principle embodied in articles 2 and 4—a principle that induces compliance by linking the benefits of the Conventions to acceptance of their obligations.[22] *See* Bybee Memorandum, *supra* note 5, at 10.

Our recourse to fundamental principles to address an ambiguity in article 4 is not unusual. In the context of the law of armed conflict, interpreters faced with changed or unexpected circumstances have not hesitated to resort to a treaty's fundamental principles to avoid a non-contextual reading of a treaty term that, wrenched from its original context, might lead to a conclusion that does violence to the treaty's object and purpose. And they have done so even when construing treaty text far less ambiguous than article 4.

For example, when the Allied Powers occupied Germany and Japan at the end of the Second World War, they did not apply rules of belligerent occupation set forth in the Hague Regulations—and in particular the duty to "respect[], unless absolutely prevented, the laws in force in the country," *see* Hague Regulations art. 43—that were premised on fundamental assumptions that did not apply in those contexts.[23] Similarly, following the end of active hostilities in the Korean War, the

---

[22] This principle would apply even if the entity that does not accept the burdens of the Convention is or becomes actively intertwined in the armed conflict between the signatory States. *See* GC4 art. 2(3) (providing that when a "Power[] in conflict" is *not* a Party, the Powers who are parties remain bound by it only in "their mutual relations"); *id.* art. 4(2) (providing that "Nationals of a State which is not bound by the Convention are not protected by it").

[23] *See, e.g.*, R.Y. Jennings, *Government in Commission*, 23 Brit. Y.B. Int'l L. 112, 135–36 (1946) (noting that the assumptions of the Hague Regulations—concerning the need to protect the sovereignty of the legitimate government of the occupied territory and the inhabitants of the occupied territory from being exploited for the prosecution of the occupant's war—were not served by application of the Regulations to occupied Germany, and concluding that "the whole *raison d'être* of the law of belligerent occupation is absent in the circumstances of the Allied occupation of Germany, and to attempt to apply it would be a manifest anachronism"); W. Friedmann, *The Allied Military Government*

United Nations Powers declined to repatriate POWs who feared to return to their countries, even though article 118 of GPW states that POWs "shall be released and repatriated without delay after the cessation of active hostilities," and even though article 7 of GPW makes the right of repatriation non-waivable. The United States and others supported this conclusion based on the fundamental purposes underlying the Convention.[24] In 1968, the Privy Council declined to extend POW status under GPW to nationals of the State that captured them even though article 4 of GPW contains no such express exception.[25] This conclusion, which is generally approved by commentators,[26] was premised on the view that the fundamental purpose of the Convention was "for the protection of the members of the national forces of each against the other."[27]

Finally, the International Criminal Tribunal for the Former Yugoslavia ("ICTY") has twice read GC4 article 4's definition of "protected persons" to include within the class of "protected persons" nationals of the party to the conflict in whose hands they are found.[28] The ICTY tribunals reached this conclusion, despite article 4's limitation of "protected person" status to those who find themselves in the hands of a power "of which they are not nationals," GC4 art. 4(1), on the basis of GC4's fundamental purposes—a source of interpretive guidance, the ICTY tribunals explained, that was appropriate to look to because the framers of GC4 never could have contemplated the scope or significance of "present-day inter-ethnic conflicts."[29] In these cases, the

---

*of Germany* 67 (1947) ("It is not . . . surprising that International Law . . . should not be fully equipped to deal with an entirely unprecedented situation" following post-World War II occupations.); Roberts, *supra* note 4, at 269–70 (1984) (citing Jennings and Friedman approvingly); Glahn, *supra* note 14, at 281 (Hague Regulations "lost their applicability to the Allied occupation of Germany").

[24] *See, e.g.*, Dep't of State, *Memorandum Re: Legal Considerations Underlying the Position of the United Nations Command Regarding the Issue of Forced Repatriation of Prisoners of War* (Oct. 24, 1952); Howard S. Levie, *Prisoners of War in International Armed Conflict*, 59 Int'l L. Studies 424 (Naval War College 1978).

[25] *Public Prosecutor v. Oie Hee Koi*, [1968] 2 W.L.R. 715, 727 (P.C.) (concluding that GPW "does not extend the protection given to prisoners of war to nationals of the detaining power").

[26] *See* Ian Brownlie, *Law of War—Geneva Convention Relative to the Treatment of Prisoners of War, Articles 4 and 5—Burden of Proof on Issue of Protected Status—Status of Nationals of a Person Owing 'Allegiance' to the Detaining Power*, 43 Brit. Y.B. Int'l L. 234, 235–37 (1968–1969); R.R. Baxter, Notes and Comments, *The Privy Council on the Qualifications of Belligerents*, 63 Am. J. Int'l L. 290, 291 (1969); Draper, *supra* note 17, at 193–94 n.3.

[27] *Public Prosecutor v. Oie Hee Koi*, [1968] 2 W.L.R. 715, 726 (P.C.).

[28] *Prosecutor v. Aleksovski*, Case No. IT-95-14/1-A, Appeals Chamber Judgement ¶¶ 151–52 (Mar. 24, 2000); *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgement ¶¶ 163–70 (July 15, 1999). *Cf. Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 169 (2d Cir. 2003) (noting that although the actions of the ICTY multinational tribunal may have some persuasive value, it is not "empowered to create binding norms or customary international law"); Statute of the International Criminal Court for Former Yugoslavia (as amended through May 19, 2003) (limiting ICTY's charter to prosecutions under current law).

[29] *Prosecutor v. Aleksovski*, Case No. IT-95-14/1-A, Appeals Chamber Judgement ¶¶ 151–52 (Mar. 24, 2000); *see also Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgement ¶¶ 163–70 (July 15, 1999).

ICTY tribunals read behind article 4's assumption that persons should be identified with the State of their nationality for purposes of article 4 "protected person" status when the context in which GC4 was being applied did not bear out article 4's State-centric assumptions. In *Tadic*, for example, an ICTY Appeals Chamber noted that GC4 was drafted when "wars were primarily between well-established States," and concluded, based on GC4's "object and purpose," that its State-centric terms should not be applied woodenly in unanticipated "modern inter-ethnic armed conflicts such as that in the former Yugoslavia."[30] Even more relevant for present purposes, the ICTY Court noted that in such changed circumstances, "ethnicity may become determinative of national allegiance," and that "[u]nder these conditions, the requirement of nationality is even less adequate to define protected persons."[31] In short, *Tadic* looked behind GC4 art. 4's nationality criterion to find a criterion that better served GC4's object and purpose when applied to unforeseen circumstances.

In determining whether al Qaeda operatives warrant "protected person" status in occupied Iraq, it is at least as appropriate as in the cases described above, if not more so, to look to the fundamental principles underlying GC4 to determine how a genuine textual ambiguity in article 4 should be resolved in a context wholly outside the contemplation of GC4's drafters. Our recourse to these fundamental principles supports the conclusion that, with the caveat addressed in Part III.D below, al Qaeda operatives captured in occupied Iraq lack "protected person" status under GC4.

## C. The Focus of the Fourth Geneva Convention on Protecting Citizens and Permanent Residents

We next consider the ambiguity in article 4 in light of the legal landscape against which GC4 was negotiated, as well as the negotiation record itself. *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 665–69 (1979) (emphasizing the historical background against which the treaty at issue was signed); *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) (stating that a treaty's negotiating record "may of course be consulted to elucidate a text that is ambiguous"); Vienna Convention art. 32, 1155 U.N.T.S. at 340 (providing that the "preparatory work of the treaty" may be consulted to resolve ambiguities in a treaty's text). These sources suggest that the protections that GC4 provides for some unlawful combatants in occupied territory were

---

[30] *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgement ¶ 166 (July 15, 1999).

[31] *Id.*; s*ee also* Theodor Meron, Editorial Comment, *Classification of Armed Conflict in the Former Yugoslavia: Nicaragua's Fallout*, 92 Am. J. Int'l. L. 236, 239 (1998) ("Enforcing [article 4's nationality-based criteria for 'protected person' status] literally in . . . conflicts involving the disintegration of a state or political entity and the resulting struggle between peoples and ethnic groups, would be the height of legalism. . . . In many contemporary conflicts, the disintegration of states and the establishment of new ones make nationality too messy a concept on which to base the application of international humanitarian law.").

intended primarily to protect citizens and permanent residents who participate in popular resistance movements—persons who as a general matter are not similarly situated to members of an international terrorist organization engaged in global armed conflict against the occupying powers.

Pre-GC4 international law focused on the occupying power's duty to protect the occupied territory's citizens and inhabitants, as distinct from other groups. The preamble to the 1907 Hague Regulations (which GC4 expressly preserves, *see* GC4 art. 154) declared that "the inhabitants" remained under the protection of the "principles of the law of nations as they result from the usages established among civilized peoples, from the laws of humanity, and the dictates of the public conscience." Hague Regulations pmbl. Subsequent international law retained this general focus. For example, the London Charter for the Nuremberg Trials considered "deportation" to be a war crime, and legal actions under that instrument—including judgments of the International Military Tribunal at Nuremberg—were used to punish actions directed at the occupied country's citizens and inhabitants.[32]

GC4 derives from this tradition. Article 65 of GC4 specifies that penal provisions enacted by the Occupying Power "shall not come into force before they have been published and brought to the knowledge of the *inhabitants* in their own language." In like manner, GC4 requires the Occupying Power to ensure the food and medical supplies "of the population" (art. 55), to ensure relief schemes if "the whole or part of the population of an occupied territory is inadequately supplied" (art. 59), and to "facilitate the proper working of all institutions devoted to the care and education of children" (art. 50). Each of these provisions suggests obligations focused on persons who constitute the permanent residents of the area.

A similar focus underlies article 5's express protection for "spies," "saboteurs," and "person[s] under definite suspicion of activity hostile to the security of the Occupying Power." In the *travaux préparatoires*, the GC4 drafters assumed that the protections they conferred on certain unlawful combatants were for local citizens or permanent residents who engaged in activities hostile to the occupying power. For example, in describing article 5, the Committee III Report said: "In occupied territory, the fact that *a national of the Occupied Power* harbours resentment against the Occupying Power is likewise insufficient [to deny rights of communication under Article 5]." 2A *Final Record* at 815. Similarly, the Soviet

---

[32] The focus on protecting citizens and inhabitants was evident, for example, in the definitions of the crime of "deporting civilians" that emerged from *United States v. Milch*, 2 Trials of War Criminals Before the Nuremberg Military Tribunals 353 (1946–1949) (trial of Field Marshal Erhard Milch). The indictment in *Milch* defined the crime of deportation to involve "citizens," the prosecutor described the crime to involve "people who had been uprooted from their homes in occupied territories," the three-judge tribunal convicted the defendant for the crime as charged, Judge Musmanno's concurring opinion described the crime as extending to the occupied territory's "inhabitants," and the concurring opinion of Judge Phillips described it as extending to the "population" of occupied territory. *Id.* at 691–93, 790, 879, 866.

delegate assumed that protected unlawful combatants in occupied territory were "citizens" of the occupied country. *See* 2B *Final Record* at 379 ("I would like to ask the originators of article 3A, and those who light-heartedly support it, whether there is in the whole world a country whose *citizens* would be loyal to the Occupying Power.").[33]

The protections for POWs in occupied territory conferred by GPW confirm the Geneva Conventions' focus on the citizens and permanent residents of occupied territory, as opposed to international terrorists. GPW extended POW status for the first time to "[m]embers of . . . militias and members of other volunteer corps, *including those of organized resistance movements*, belonging to a Party to the conflict and operating in or outside their own territory, *even if this territory is occupied*," provided that they satisfy the traditional criteria for lawful combatancy. GPW art. 4(A)(2) (emphasis added). The drafters of GPW included this provision to confer future protections on some (though not all) of the actions of resistance movements like those that fought the Nazis in occupied territory in World War II.[34] In article 4(A)(2)'s negotiating history, the delegates understood and assumed that the militia and volunteer corps entitled to protections in occupied territory were indigenous resistance movements comprised of citizens, or at the very least permanent residents, of the occupied countries.[35] And in the debate over the GPW Convention, numerous participants expressed sympathy for combatants fighting the occupying power for reasons of "patriotism"—a term that can only be assumed

---

[33] *Cf.* 2B *Final Record* at 379 (Mr. Morosov (Soviet Union)) ("Nor has this stipulation any bearing whatsoever on members *of the civilian population of occupied territories* suspected of activity hostile to the State") (emphasis added); *id.* ("What has been said about alien nationals of an enemy Power who may be in the territory of a belligerent is even more applicable to *the civilian population of occupied territories*.") (emphasis added).

[34] *See* 2A *Final Record* at 562 (Committee Report) (describing the protections accorded by article 4A(2) as "an important innovation . . . which has become necessary as a result of the experience of the Second World War"); *The Geneva Conventions of 12 August 1949, Commentary, III Geneva Convention Relative to the Treatment of Prisoners of War* 58 (Jean S. Pictet ed., 1960) ("[T]he term 'resistance' . . . constitutes a clear reference to the events of the Second World War and to the resistance movements which were active during that conflict."); Levie, *supra* note 24, at 39 ("During World War II so-called resistance movements sprang up or were created within the territory of most of the countries occupied by an enemy, whether the occupation was partial or total. It was with respect to the status of members of *these types of resistance movements* that the 1949 Diplomatic Conference was attempting to make provision.") (emphasis added).

[35] *See, e.g.*, 2A *Final Record* at 240 (Mr. Cohn (Denmark)) ("Civilians who took up arms in good faith for the defence of *their* country against an invader should . . . have the benefit of the protection accorded to prisoners of war") (emphasis added); *id.* at 241 (Mr. Larmale (France)) ("recall[ing] the discussions on the subject of the importance of *resistance movements* which had taken place at the Conference of Government Experts") (emphasis added); *id.* at 242 (Mr. Pesmazoglou (Greece)) (urging that the term "member of a resistance movement" be included in article 4(A) and not the term "partisan" since "it was a question of *national*, and not political, movements") (emphasis added); *id.* at 426 (General Slavin (Soviet Union)) ("Civilians who took up arms in defence of the liberty of *their* country should be entitled to the same protection as members of armed forces") (emphasis added).

to refer to citizens.[36] In short, both GPW and GC4 contemplate protections in occupied territory primarily for local citizens or permanent residents. When such persons fight on behalf of movements that respect the laws and customs of war, they receive POW status, *see* GPW arts. 4(A)(2); 4(A)(6); those who do not respect the laws and customs of war receive "protected person" status under GC4.

In sum, GC4's drafting history, read in context, shows that GC4 was designed to confer "protected person" status primarily on citizens or permanent residents of occupied territory, whether unlawful combatants or not, but not on operatives of an international terrorist organization who are in occupied territory as part of a global armed conflict. It is natural to view citizens and permanent residents of occupied territory as persons who "find themselves" in the hands of the Occupying Power, and the resistance activities of citizens and permanent residents are most clearly within the contemplation of the Geneva Conventions.[37] By contrast, with a caveat noted directly below, members of an international terrorist organization in occupied territory to attack the occupying power are clearly outside the core concern of GC4 and are difficult to characterize as persons who "find themselves" in occupied territory, especially since the conferral on them of "protected person" status would create tension with the Geneva Conventions' fundamental principle that warring entities must accept the Conventions' burdens in order to claim their benefits.

## D. Iraqi al Qaeda Captured in Occupied Iraq

The analysis thus far suggests that the ambiguity in article 4 should be resolved by excluding al Qaeda terrorist operatives found in occupied Iraq from "protected person" status. However, there is a sub-category of al Qaeda operatives—those who are Iraqi nationals or permanent residents—for which the analysis differs. Unlike non-Iraqi terrorist operatives, citizens and permanent residents of Iraq could be said to "find themselves" there even under the narrow reading of article 4. Such persons' presence in occupied Iraq could be attributed as much to their status

---

[36] *See, e.g.*, 2A *Final Record* at 242 (General Sklyarov (Soviet Union)) (describing the militia and volunteer corps as "organizations which had out of *patriotism* taken up arms to defend the honour and the independence of *their* country") (emphasis added); *id.* at 422 (Mr. Gardner (England)) (characterizing guerilla forces as those that "began by being groups of *patriots* and gradually established discipline") (emphasis added).

[37] We note that *stateless noncombatants* might also be among the residents that the GC4 framers meant to include within "protected persons," at least when they "find themselves" in occupied territory at the time of occupation or as a result of having fled there after occupation as refugees of war. *See, e.g.*, 2A *Final Record* at 621 (Mr. Castberg (Norway)) ("ex-German Jews denationalized by the German Government, who found themselves in territories subsequently occupied by the German Army . . . should be able to claim protection under the Convention"); *see also* ICRC Commentary on GC4, *supra* note 4, at 47 (stating that article 4 was drafted to ensure that protections would not be withheld from refugees who "had fled from their homeland and no longer considered themselves, or were no longer considered, to be nationals of that country").

as citizens or permanent residents who owe that country allegiance as to their status as agents of an international terrorist organization engaged in global armed conflict with the occupying powers. Furthermore, as explained above, the negotiating record makes clear that GC4 was primarily designed to protect citizens and permanent residents of occupied territory, including those who commit hostile acts against the occupying power. "Protected person" status under GC4 exists primarily for the benefit of these persons even when they act as unlawful combatants. It is true that reading article 4 to protect anyone in Iraq who fights on behalf of an enemy force that does not assume the burdens of GC4 is in tension with GC4's benefits-burden principle, described above. But in the context of citizens or permanent residents of Iraq, we conclude that the text of article 4 (which is less ambiguous in this narrow context) and the negotiating record provide more compelling interpretive guidance than the guidance we derive from the benefit-burdens principle.

## IV. Conclusion

We conclude that the following persons, if captured in occupied Iraq, are not "protected persons" within the meaning of GC4 article 4: U.S. nationals, nationals of a State not bound by the Convention, nationals of a co-belligerent State, and operatives of the al Qaeda terrorist organization who are not Iraqi nationals or permanent residents of Iraq.

JACK L. GOLDSMITH III
*Assistant Attorney General*
*Office of Legal Counsel*
